OPINION OF THE COURT
Charles E. Ramos, J.
"This is true liberty, when free-born men,
"Having to advise the public, may speak free;
"Which he who can and will deserves high praise,
"Who neither can nor will may hold his peace.
"What can be juster in a state than this?” (Euripides, The Suppliants.)
The anonymous plaintiff seeks damages from the defendants, a newspaper reporter and his paper, for defamation and intentional infliction of mental distress. At this juncture, the plaintiff moves for various relief in aid of discovery and to add Mortimer Zuckerman as an additional defendant. The defendants cross-move for a stay and the proposed additional defendant resists being joined.
Those portions of the motions (a) that request a direction that the defendants produce documents and (b) seek to set a specific date for deposition of the individual defendant, Mike McAlary, a reporter for the Daily News, are moot. The defendant’s cross motion for a stay is also moot. These issues were resolved at oral argument through the cooperation of counsel. The issues relating to discovery will be addressed in an accompanying memorandum decision and order. The *3 instant opinion will deal with the issues raised in connection with plaintiff’s application to join Mr. Zuckerman as an additional defendant.
FACTUAL BACKGROUND
It is alleged that Mr. McAlary defamed the plaintiff when he stated in three of his newspaper columns that the plaintiff falsely reported to the police that she had been raped. Her motivation, as speculated by Mr. McAlary, was to enhance her status in the effort to focus attention on the problem of violence against women, gays and lesbians.
Although the plaintiff asserts that her complaint of rape was truthful and was not motivated by an attempt to bring attention to herself, she concedes that police officers investigating her complaint harbored doubts about the incident and questioned her motives. Notwithstanding those doubts, this court assumes that the attack did occur as Ms. Doe reported.
The plaintiff seeks to hold Mr. Zuckerman personally responsible for the libel because he hired Mr. McAlary with knowledge that Mr. McAlary had a penchant for twisting and slanting the truth and had knowingly fabricated facts contained in previously published articles.
In this determination, the court will accept the plaintiff’s characterization of Mr. McAlary and that Mr. Zuckerman had prior knowledge of his character. Although the plaintiff was not named in any of the articles, in the determination of these motions this court will not address any defenses that the libel did not identify her. This court will also assume that the plaintiff satisfies the standard as a public figure and that the subject reported on by McAlary was of public concern. There is no question that violence towards women and rape in particular is a matter of paramount public concern.
The court’s assumption that Jane Doe herself is a public figure derives from the affidavits of her counsel. It is uncontested that the plaintiff was about to project herself into the public debate on issues she cares about by making a ''statement concerning her own feelings as a rape victim * * * at an upcoming scheduled rally against gay and lesbian violence * * * she wanted to talk about the need for women to learn basic self-defense techniques”. (Affidavit of Singleton para 7, Mar. 28, 1995.) In essence she chose to cross over from being a private to a public figure. It was this expressed desire to seek publicity about her own victimization, prior to McAlary’s first article, that made her the newsworthy, public figure that the defendants made the subject of their criticism.
*4 A public figure has channels, even though those channels may not be as strong or extensive as a public official, to defend against criticism in the media. This effort resulted in several news articles, annexed as exhibits to the Singleton affidavits and a public apology from Police Commissioner Bratton. An audience equal to or potentially larger than the readership of the McAlary columns was accessed by her, something private figures lack.
The plaintiff proposes to add Mr. Zuckerman, a limited partner of Daily News, L.P., as a defendant, without alleging any new causes of action against him. She seeks to hold him personally liable under the same three counts of libel and one count of intentional infliction of emotional distress set forth in the original complaint against Mr. McAlary and the Daily News.
The plaintiff alleges that Mr. Zuckerman was involved in the decision to publish Mr. McAlary and that he knew or should have known that the articles were false and libelous. Although plaintiff alleges that Mr. Zuckerman was aware of Mr. McAlary’s propensity to fabricate information and was therefore negligent in hiring him, plaintiff offers no evidence that Mr. Zuckerman had anything to do with the writing, editing and disseminating of the three columns at issue and the plaintiff has added no new cause of action for negligence.

Libel and a Free Press

Because the plaintiff seeks to make the publisher of a daily newspaper answer in damages for running a story that defamed her, this court must contend with the conflict between the right of a free press and the private right of the plaintiff to recover money damages for the harm to her reputation.
This conflict between the private right to sue for libel and the right granted to the press and the people to speak freely as guaranteed by the United States and New York State Constitutions had its genesis in the dissimilarity between the English common law and the American concepts of liberty. An analysis of the development of that conflict is critical in the determination of this motion.
The philosophical and political differences evident as the former colonies began to assert their independence from Britain have never been resolved regarding the law of libel. Although English common law was adopted as our common law, libel, particularly seditious libel (criticism of the Crown), was anathema to those former colonists who were openly critical of *5 British rule. We adopted the concepts of free speech and free press that were at odds with restrictive British traditions because the press had proved to be an effective vehicle to arouse popular sentiment in favor of liberty and, ultimately, revolution and independence.
The view that free speech and a free press are needed to guarantee liberty is as old as democracy itself (see, The Suppliants, op. cit), and disdained by those who hold or seek to hold power for themselves, regardless of their political views. However, the development of democracy and personal freedom has not been constant throughout history. During the Dark Ages, religious dogma and political stagnation stifled the intellect. The democratic ideals of Greece were lost to Europe for centuries. Fortuitously, Greek and Roman texts were stored in African libraries and were reintroduced into Europe through Moorish Spain. After centuries of suppression, the revival of political and philosophical activity was greatly accelerated by the invention of the printing press. Soon the printed word was a weapon feared by those in power. What had been heresy in the Dark Ages had become seditious libel. As a result, State control of the press began.
The principles adopted by the breakaway colonies and later embodied in the Bill of Rights were refined during the religious and political conflicts of 17th century England, the motherland of most influential colonists. Monarchists, Roundheads, Puritans, Separatists, Utopians, Levelers and Diggers, to name a few, struggled to chart the course of England’s constitution.
In this environment, John Milton championed the concept of a free press in the Areopagitica, his eloquent petition to Parliament. Milton sought to reverse Parliament’s Licensing Act which provided that no book, pamphlet, or paper could be printed unless first approved and licensed by the Crown.
Milton’s plea speaks directly to the issue presented in the instant case: should libelous speech be protected speech?
"[W]hen complaints are freely heard, deeply considered, and speedily reformed, then is the utmost bound of civil liberty attained that wise men look for * * * the difference is of bad books (libelous, heretical) that they to a discreet and judicious reader serve in many respects to discover, to confute, to forewarn, and to illustrate.
"A man may be a heretic in the truth; and if he believe things only because his pastor says so, or the assembly so determines, without knowing other reason, though his belief *6 be true, yet the very truth he holds becomes his heresy.” (Areopagitica [1643].)
Notwithstanding Milton and others the balancing of the conflict between the English common-law right to punish libel and the need for a free press received a slow and uneven start in England.
The British Bill of Rights (1 W & M, Sess 2, c 2 [1689]), enacted upon the restoration of the monarchy, provided for freedom of speech and press, but only for members of Parliament. "That the Freedome of Speech and Debates or Proceedings in Parlyament ought not to be impeached or questioned in any Court or Place out of Parlyament.” (Costin and Watson, The Law and Working of the Constitution 1660-1914, at 70 [A&C Black].)
The people and the press enjoyed no such freedom. By unanimous resolution, Parliament prohibited the press from reporting or commenting on the debates and proceedings of Parliament, even if they were truthful. (Parl Hist, x, 800 if [Apr. 13, 1738].) Writers and publishers were to be held accountable for all publications in which the government was criticized, regardless of the truth of the charges.
Publications in contravention of these press restrictions were ordered burned by the common hangman. This was, however, a considerable improvement over torture and capital punishment and trials in which the jurors were denied their requests to read the allegedly libelous material before they rendered their verdict and were required to find defendants guilty of libel or themselves be fined and imprisoned.
Nothing resembling our First Amendment protection for freedom of the press existed before our independence from Britain. Upon independence, eight of the original 13 colonies codified freedom of the press within their own constitutions. Their intention was clear. "That the freedom of the press is one of the great bulwarks of liberty, and can never be restrained but by despotick governments.” (Va Bill of Rights § 12 [June 12, 1776].)
The adoption of the First Amendment removed any basis for the Federal prosecution of the press for libel. Subsequently, the 14th Amendment extended those Federal protections to bar State action. Nevertheless, the conflict between the common law of libel and our constitutional freedom of the press continues long after our break from Britain. Relentless pressure from litigants seeking redress for real or imagined harm *7 has eroded the liberties so passionately coveted by those former subjects of English justice and has forced a gradual reacceptance of the British law of libel. The most significant return to the British doctrine of libel has been the reintroduction of the concept of malice.
The civil libertarian view is that malicious speech is still protected speech. "The best of newspapers reflect the publisher’s opinions. A great editor, E.W. Scripps, once said: 'humanity is vulgar; so we must be vulgar * * * It is passionate; therefore, the blood that runs in our veins and in our newspapers must be warm.’ His successor, Roy Howard, in 1912 declared, T do not subscribe to the general idea that news and opinion are two different and easily separated elements’ * * * Under our philosophy of a free press each publisher has a right to be wrongheaded and even malicious. That is our creed-and we are safe adhering thereto as long as there are enough different wrongheadednesses in the market.” (Ernst, The First Freedom [1946].) "If all printers were determined not to print any thing till they were sure it would offend no body, there would be very little printed.” (Franklin, An Apology for Printers [1731], reprinted in Levy, Freedom of the Press From Zenger to Jefferson; Early American Libertarian Theories, at 6.)
In contrast is the landmark ruling of the United States Supreme Court in New York Times Co. v Sullivan (376 US 254 [1964]), which limits constitutional protection for allegedly malicious publications. Times is the seminal case upon which the plaintiff’s claim against Mortimer Zuckerman depends.
In Times (supra), actual malice was held to be the constitutional standard in determining the libel claims of plaintiffs. This case involved an editorial advertisement in the New York Times which allegedly defamed an Alabama City Commissioner. The official claimed that the advertisement could be read as imputing to him various acts of intimidation and violence.
In Times (supra), the Court first articulated the question of constitutional limitations to State libel actions and the protections afforded free speech and the press. (Supra, at 256.)
Writing for the majority, Justice Brennan created a doctrine of actual malice based on a less favored common-law definition which focused on bad faith by the publisher. (Supra, at 280-281.) Rather than adopting the common-law malice standard outright, the Court crafted a constitutional test of actual knowledge of the falsity or reckless disregard for the truth. *8 (Supra, at 279-280.) After Times, the constitutional privilege would not grant immunity from suit if actual malice was alleged. (Supra, at 282-283.)
Three Justices concurring in the outcome were not satisfied with Brennan’s reasoning. Justices Black, Douglas and Goldberg favored absolute immunity for criticism of public officials. They opined that the First Amendment’s central meaning was the right to criticize without being held to a particular standard of truth. (New York Times Co. v Sullivan, supra, at 297 [Black, J., concurring].) Justice Goldberg believed that Justice Brennan had premised his entire opinion on the historical concept of a free and uninhibited press, then shied away from his own logic in applying it. (Supra, at 298 [Goldberg, J., concurring].) Justice Black argued that "the Federal Constitution has dealt with this deadly danger to the press in the only way possible without leaving the free press open to destruction — by granting the press an absolute immunity for criticism of the way public officials do their public duty.” (Supra, at 295 [Black, J., concurring].) Just as the Sedition Act of 1798 was recognized as a violation of the First Amendment, so, too, did Justice Black feel any restrictions on the right to criticize with impunity should be found void. (Supra, at 295-296.) Echoing Milton’s Areopagitica, the concurring Justices concluded that while deliberate and maliciously false statements may not have value as free speech, leaving the determination of what constitutes such speech to a Judge and jury would have a chilling effect on legitimate, desirable speech. (Supra, at 300.)
In addition to being faulted for its interpretation of the First Amendment guarantees, the majority opinion’s definition of malice was also criticized. " 'Malice,’ even as defined by the Court, is an elusive, abstract concept, hard to prove and hard to disprove.” (New York Times Co. v Sullivan, supra, at 293 [Black, J., concurring].)
Prior to the adoption of the Bill of Rights, the law of libel presumed the presence of malice in the defamatory publication. "[L]ibels, libelli famosi * * * are malicious defamations of any person * * * in order to provoke him to wrath or expose him to public hatred, contempt or ridicule. [I]t is immaterial, with respect to the essence of a libel, whether the matter of it be true or false, since the provocation, and not the falsity, is the thing to be punished criminally”. (4 Blackstone, Commentaries on the Laws of England, at 1550.)
Thus, by overturning the British law of libel in our Bill of Rights, the malice standard should have been relegated to his *9 tory. Instead, it was revived in Times (supra) as a confusing and undefinable basis for prosecution of the press.
Justice Black predicted that the majority’s requirement of proof of actual malice would prove to be an evanescent protection” for freedom of criticism. (New York Times Co. v Sullivan, supra, at 293.) Judges and juries would get around it, he said: "This record certainly does not indicate that any different verdict would have been rendered here whatever the Court had charged the jury about 'malice,’ 'truth,’ 'good motives,’ 'justifiable ends,’ or any other legal formulas”. (Supra, at 295.) In response to this concern, Justice Brennan took an extraordinary step to ensure that the Alabama courts could not find actual malice when the case was returned to the State court. He prevented the case from returning to Alabama by reexamining the facts and finding there was no basis for a verdict of actual malice. The case was ultimately disposed of by the Supreme Court deciding not only the legal issues, but the facts as well. (Supra, at 286-287.)
Justice Harlan later underscored the folly of leaving the determination of malice to local juries by pointing out that the truth is especially hard to define when it comes to ideas. "Any nation which counts the Scopes trial as part of its heritage,” he said, "cannot so readily expose ideas to sanctions on a jury finding of falsity.” (Time Inc. v Hill, 385 US 374, 406 [1967] [Harlan, J., concurring in part and dissenting in part].) The expedient strategy which Brennan used to protect the New York Times from the inherent flaw in Times (supra) has wreaked havoc with the subsequent development of the rule and should prove to be the basis of its undoing. As will be demonstrated, the practical effect of the rule in Times is to permit plaintiffs to sue but rarely to permit them to succeed. The net result has been much expensive and pointless litigation, the threat of which imperils less wealthy publishers and works to undo the rights Times professes to recognize. (See, Lewis, New York Times v. Sullivan Reconsidered: Time to Return to The Central Meaning of the First Amendment”, 83 Colum L Rev 603 [1983].)
The problem with the Supreme Court’s approach is that the Times standard does not hold true to the purpose of the First Amendment. While Times (supra) does address some of the threats to liberty inherent in the common law, it is not an accurate reflection of the Constitution. The Times test only protects mistakes, not deliberate attacks and such vigorous speech as is the basis of our traditional notions of freedom.
The criticism by Justices Black, Douglas and Goldberg predicted the morass which Times (supra) would lead libel law *10 into. Confusion over the standard of malice, the imbalance between the protection given private citizens over public officials, and the constant tug-of-war over what persons and what speech falls under the Times standard have become the main focus of the Court’s recent decisions. In so doing, the Court has failed to pursue its ultimate purpose: interpretation of the Federal Constitution. As Justice Brennan himself wrote in the Times majority opinion, "[t]he constitutional safeguard * * * 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.’ ” (376 US 254, 269 [1964], supra [quoting Roth v United States, 354 US 476, 484].)
If robust, uninhibited debate is the cornerstone of the Constitution, then any infringement on the freedom of speech and press is unconstitutional. While absolute immunity protects the press from suit even when the publication is in error, it is equally true that qualified immunity will inhibit the free debate that leads to the truth. (Areopagitica, op. cit.)
The rule enunciated in Times (supra) represents a significant loss of the freedoms guaranteed by the admonition "Congress shall make no law * * * abridging the freedom of speech, or of the press”. (US Const 1st Amend.) Times fails to reject the British common-law rule and has imposed a standard of libel so ill-defined and uncertain as to be incapable of consistent application.
Finally, the Times standard does not afford equal protection to all people in all matters. The current state of the malice standard enunciated in Times (supra) is confused, unpredictable and often capricious. The sliding scale approach formulated by the Court has resulted in the appearance that the First Amendment does not apply equally to either speakers or speech of public concern. The text of the First Amendment draws no such distinctions, and neither should the Court.
CONCLUSION
There is a theme that comes to us from ancient Euripides, through Milton to the concurring Justices in Times (supra): freedom of the press is inconsistent with the law of libel: even libelous and malicious reports by the press must be privileged. "[T]he difference is of bad books (libelous, heretical) that they to a discreet and judicious reader serve in many respects to discover, to confute, to forewarn, and to illustrate.” (Milton, Areopagitica, op. cit.) "The impressive array of history and precedent marshalled by the Court, however, confirms my belief *11 that the Constitution affords greater protection than that provided by the Court’s standard to * * * [the] press * * * In my view, the First and Fourteenth Amendments to the Constitution afford to the * * * press an absolute, unconditional privilege to criticize official conduct despite the harm which may flow from excesses and abuses.” (New York Times Co. v Sullivan, 376 US, at 298, supra [Goldberg, J., concurring].) "That this [press] liberty is so often carried to excess; that it has sometimes degenerated into licentiousness, is seen and lamented, but the remedy has not yet been discovered.” (VI Writings of James Madison 1790-1802, at 336 [Hunt ed 1906].)
The importance of the First Amendment today, as well as through history, is that it protects the press from suits for libel, the only effective weapon of those who seek to stifle criticism. This society can tolerate bad books or newspapers; no free society can tolerate censorship, before or after the fact. The loss of the plaintiff’s claim against Mortimer Zuckerman is but a part of the price we pay for our liberty.
The plaintiff’s claim fails to establish any basis upon which Mortimer Zuckerman can be held to account for libel under the First Amendment and the rule in Freeman v Johnston (84 NY2d 52 [1994]). The motion for leave to join him as an additional defendant is denied.