OPINION OF THE COURT
Charles Edward Ramos, J.
The defendants move for a dismissal of the complaint contending that the press freedom guaranteed by the First and Fourteenth Amendments of the United States Constitution grants them an absolute privilege to comment on matters of public concern. [Material omitted.]
FACTUAL BACKGROUND
The plaintiff alleges that the defendants defamed the plaintiff in three newspaper columns that stated that she falsely reported to the police that she had been raped. Mr. Mc-Alary wrote the three articles that appeared in the Daily News. *322 The articles reported that the police had doubted her claim of rape, severely criticized her for making a false claim, but did not identify her. She remains anonymous. The plaintiff alleges that Mr. McAlary twisted and slanted the truth and knowingly fabricated facts.
This opinion will deal solely with the constitutional defenses. Common-law issues will be dealt with separately.
PRESS FUNCTION
Judge Learned Hand defined the function of the press as follows: "the newspaper * * * industry serves one of the most vital of all general interests: the dissemination of news from as many different sources, and with as many different facets and colors as is possible. That interest is closely akin to, if indeed it is not the same as, the interest protected by the First Amendment; it presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.” (United States v Associated Press, 52 F Supp 362, 372 [1943].)
Judge Hand’s definition of the press function is not expressed in terms of the right of the press to be free of restraint, instead it speaks of access to opinion[1] and information. The press is to provide news and opinion on issues of legitimate public concern. Excluded from this function is the publication of matters not newsworthy, yet the exclusion is so limited that subjects encompassed within the right of privacy may in certain circumstances be published. The courts have uniformly described the test as an overriding State interest. (Florida Star v B. J. F., 491 US 524 [1989].)
Among the matters not afforded First Amendment free speech and free press protection are: obscene speech and "fighting words” (Roth v United States, 354 US 476 [1957]; Chaplinsky v New Hampshire, 315 US 568, 571-572 [1942]; cf., Harisia *323 des v Shaughnessy, 342 US 580, 591-592 [1952]), advocating the violent overthrow of the Government (Near v Minnesota, 283 US 697, 716 [1931]), or the publication of troopship sailings during wartime (Rosenbloom v Metromedia, Inc., 403 US 29, 44 [1971]). Only those matters within the press function, those that are newsworthy, merit constitutional protection under freedom of the press.
The plaintiff does not contend that a false claim of rape would not be newsworthy, but that the articles about her were spurious. "The essence of the tort of libel is the publication of a statement about an individual that is both false and defamatory. Since falsity is a sine qua non of a libel claim and since only assertions of fact are capable of being proven false, we have consistently held that a libel action cannot be maintained unless it is premised on published assertions of fact (Gross v New York Times Co., supra, at 152-153; Immuno AG. v MoorJankowski, supra; see also, Milkovich v Lorain Journal Co., 497 US 1, 17-21).” (Brian v Richardson, supra, at 50-51.)
Assuming a falsehood, what then is the scope of the right to publish on an issue of legitimate public concern? Is the constitutional privilege absolute or, if limited, what is its reach? What penalty for innocent error or willful character assassination?
The answers to these questions lie within the singular historical development of our Constitution.
DISCUSSION
Absent a constitutional bar, a plaintiff may sue the press for libel at common law, with truth a defense in name only. "A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions — and to do so on pain of libel judgments virtually unlimited in amount — leads to a comparable 'self-censorship.’ Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. See, e.g., Post Publishing Co. v. Hallam, 59 F. 530, 540 (C. A. 6th Cir. 1893); see also Noel, Defamation of Public Officers and Candidates, 49 Col. L. Rev. 875, 892 (1949) * * * The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments.” (New York Times Co. v Sullivan, 376 US 254, 279 [1964].) However, our Constitution has provided for basic liberties from the outset.
*324 The First Amendment of the US Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.”
The First Amendment does not state that its prohibitions on the power of Government are absolute or that it was the intent of the framers to eliminate the common-law right to sue for libel. As a consequence, ceaseless debate has ensued on the scope of "the freedom of ** * * the press”.
This court concludes that as a restriction on the power of the Federal Government, the First Amendment was absolute leaving the States free to impose whatever limitations on the press they chose. The Fourteenth Amendment extended those absolute restrictions on Federal power to limit the power of the States. Therefore, all levels of government are now denied the authority to control the press.
LIMITATIONS ON GOVERNMENTAL ACTION — THE HISTORICAL BACKGROUND
In this court’s prior opinion (167 Misc 2d 1 [1995]), the historical argument for freedom of expression was traced from Euripides through Milton and the framers to Anthony Lewis. We will not recapitulate. Nor will we repeat our criticism of the use of malice as a basis upon which an action for libel may escape constitutional prohibition. We will limit our inquiry to the nature of the rights set forth in the First Amendment as of the time of its adoption and how subsequent constitutional development has transformed those rights.
[Material omitted.] In his plea for absolute freedom of speech and press, Supreme Court Justice Hugo Black stated succinctly, "No law, means no law,”[2] referring to the First Amendment’s plain language, "Congress shall make no law”. His insight was that the prohibitions against Federal governmental action contained in the First Amendment were intended as absolute. If he was correct, the application of those prohibitions would preclude suits sounding in libel against the press. Grounds exist in addition to the plain language of the First Amendment that support his view.
*325 INTERPRETATION
"It is not for nothing that with the emergence of a literary culture the idea of ’philology’, 'love of speech’, was transferred entirely to the all-embracing art of reading, losing its original connection with the cultivation of speech and argument. A reading consciousness is necessarily historical and communicates justification if, with Hegel, one says that history begins with emergence of a will to hand things down, to make memory last * * *
"Writing has the methodological advantage that it presents the hermeneutical problem in all its purity, detached from everything psychological. What is, however, in our eyes and for our purpose a methodological advantage is at the same time the expression of a specific weakness that is characteristic of writing even more than language. The task of understanding is seen with particular clarity when we recognize this weakness of all writing. We need only to think again of what Plato said, namely that the specific weakness of writing was that no one could come to the aid of the written word if it falls victim to misunderstanding, intentional or unintentional.” (Gadamer, Truth and Method, The Elevation of the Historicality of Understanding to the Status of the Hermeneutical Principle [I960].)[3]
The most obvious difficulty in understanding the First Amendment arises from the fact that this court was not present at the time of its adoption or of the Constitution’s most significant Amendment (the Fourteenth). "A philosopher is compelled to follow the maxim of epic poets and to plunge in medias res. The origin of things, if things have an origin, cannot be revealed to me, if revealed at all, until I have traveled very far from it, and many revolutions of the sun must precede my first dawn. The light as it appears hides the candle.” (Santayana, Scepticism and Animal Faith [1923].)
When the epic poet Sophocles penned Oedipus Tyrannus, he could assume that his Athenian audience was familiar with the legend of King Oedipus so that his tragedy could begin at the midpoint of Oedipus’s life and let explanations reveal themselves as the tale unfolded. We are also compelled to plunge in medias res, but unfortunately our understanding of the framers’ intent suffers from the complex and often overlooked facts of history. Unlike the epic poets who, if they were not true to the State religion, risked denunciation as *326 heretics by Athenians familiar with their own mythology and history,[4] those who interpret and apply our Constitution today have been unfettered by such considerations.
THE MYTH OF ORIGINAL INTENT
At the outset the framers did not provide for the constitutional rights of freedom of religion, speech or press that we enjoy today. In the immediate postrevolutionary period the States could deny what we now consider to be fundamental liberties, our constitutional rights — without violating the United States Constitution.
The framers’ experience as colonists living under the rule of the Crown gave them cause to fear that power does corrupt and to expect abuses by those about to come to power.[5] They harbored misgivings of a strong central Government and first dealt with their concerns by adopting the ineffectual and short-lived Articles of Confederation (1778), which were structured to preserve local political control by providing for a national Government with no real power.[6] The need to restrict Federal power manifested itself in the proposal of amendments to the Constitution once it was clear that the Articles of Confederation were to be replaced by the present Constitution.
The States that ratified the Constitution had less in common than our idealized view of history admits of. Their populations had opposite views on slavery, religion, trade, and politics. Travel and communications were painfully slow, so much so that many States and parts of States existed independently of one another. Typically, the western, frontier areas would be at violent political odds with their eastern cousins within the same State.[7] As the new Constitution was debated, delegates at *327 the State ratification conventions insisted on protection of their local interests, preferences and prejudices.
It is likely the Constitution would never have been adopted without the Bill of Rights, which first surfaced as proposed amendments in the State ratifying conventions.[8] The 10 Amendments that were finally adopted as the Bill of Rights were hardly a shadow of those recommended in convention.[9]
At the Federal level, the framers did not seek to establish rights of national citizenship that would, for example, grant universal freedom of religion, speech or press. Instead, the lack of trust between States, regions and groups[10] brought forth a consensus that each State would continue to possess the common-law power to control their communities. This was effected by denying power to the Federal Government. These provincial considerations diminish the emotional impact of the Bill of Rights, are not universally understood and for some are difficult to accept.[11]
As stated by Chief Justice Marshall:
"But it is universally understood, it is a part of the history of the day, that the great revolution which established the constitution of the United States, was not effected without immense opposition. Serious fears were extensively entertained that those powers which the patriot statesmen, who then watched over the interests of our country, deemed essential to union, and to the attainment of those invaluable objects for which union was sought, might be exercised in a manner dangerous to liberty. In almost every convention by which the constitution was adopted, amendments to guard against the abuse of power were recommended. These amendments demanded security against the apprehended encroachments of the general government — not against those of the local governments.
"In compliance with a sentiment thus generally expressed, to quiet fears thus extensively entertained, amendments were proposed by the required majority in congress, and adopted by *328 the states. These amendments contain no expression indicating an intention to apply them to the state governments. This court cannot so apply them.” (Barron v Mayor & City Council of Baltimore, 7 Pet [32 US] 243, 249 [1833].)
The purpose of the First Amendment was to allay the fear that the Federal Government, when lead by a President and Congress so inclined, might establish for example, a Church of America or require some form of political orthodoxy such as the Alien and Sedition Act. It also left intact State support for favored religions and slavery. Groups with such diverse and opposite views as slave owners and abolitionists, libertarians and bigots, were all in agreement on the need for the Bill of Rights at the Federal level although they disagreed on the nature of substantive liberties.
In light of the above, "original intent” is a myth.
"The motives of those clamoring for a bill of rights were complex * * *
"The overriding fear was the centralization of power in the national government * * *
"Moreover, in the case of the Bill of Rights, there is a problem more basic than the passage of time and the absence of records. In a sense, the legislative intent underlying the Bill of Rights was that there be none. In 1787 there was an overwhelming consensus among the Framers that the Bill of Rights was superfluous. Undoubtedly many who voted for it two years later still considered it unnecessary legally, however desirable it might be politically. To borrow Jonathan Swift’s metaphor, the Bill of Rights was 'a tub to the whale,’ a diversion thrown to the angry monster to keep him from destroying the ship of state.” (Anderson, The Origins of the Press Clause, 30 UCLA L Rev 455, 468, 470, 497 [1983].)
ABSOLUTE OR LIMITED
It follows that if the limitations on the power of the Federal Government as set forth in the First Amendment were to be consistent with the needs and concerns addressed by the framers, those limitations were absolute — no law meant no law.
In a speech in New York, Justice Hugo Black stated: "Just as with obscenity laws, I believe the First Amendment compels the striking down of all libel laws. Thomas Jefferson indicated as much when in 1798 he made the following statement: [The First Amendment] thereby guard[s] in the same sentence, and under the same words, the freedom of religion, of speech and *329 of press, in so much that whatever violates either throws down the sanctuary which covers the others, and libels, falsehood and defamation, equally with heresy and false religion are withheld from the cognizance of federal tribunals.” (Black, A Constitutional Faith [Mar. 24, 1937], citing Jefferson’s Writings, at 464-465 [Ford ed 1904.) [12]
That these prohibitions were absolute limitations on Federal power only, leaving the States free to promote or discourage any group, ideology or faith the local community wished, has been confirmed by the Supreme Court in Permoli v First Municipality and New York Times Co. v Sullivan (supra):
"The Constitution makes no provision for protecting the citizens of the respective states in their religious liberties; this is left to the state constitutions and laws: nor is there any inhibition imposed by the Constitution of the United States in this respect on the states” (Permoli v First Municipality, 3 How [44 US] 589, 609 [1845]). "There is no repugnancy to the constitution, because no provision thereof forbids the enactment of law or ordinance, under state authority, in reference to religion. The limitation of power in the first amendment of the Constitution is upon Congress, and not the states.” (Supra, at 606.)
"It is true that the First Amendment was originally addressed only to action by the Federal Government, and that Jefferson, for one, while denying the power of Congress 'to controul the freedom of the press,’ recognized such a power in the States. See the 1804 Letter to Abigail Adams quoted in Dennis v United States” (New York Times Co. v Sullivan, 376 US 254, 276-277, supra).
The holding articulated in Permoli (supra), which upheld as constitutional, local discriminatory restrictions on the exercise of religion, is anathema to our present understanding of the role of the State in religious and personal affairs. However, it must be admitted that our treasured constitutional liberties were, at the time of their adoption and until the Civil War, absolute restrictions on Federal power only. Permoli is not unworthy of our consideration today because its result offends us. It is an accurate assessment of the Constitution before the *330 Civil War and it confirms that the prohibitions set forth in the First Amendment were absolute.[13]
NEW YORK CONSTITUTION, ARTICLE I, § 8
[Material omitted.]
APPLYING THE ABSOLUTE LIMITATIONS ON GOVERNMENTAL ACTION TO THE STATES
The enactment of the Fourteenth Amendment created what we now consider to be our contemporary constitutional rights. It has altered the scope of our Constitution by protecting all citizens from any State action that is contrary to the Federal Constitution. "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States” (US Const 14th Amend [adopted 1868]).
The absolute prohibitions upon Federal action, i.e., "no law”, to restrict religion, speech and press, now apply to the States.
It has been argued by some[14] that the Fourteenth Amendment did not apply the First Amendment’s restrictions to limit the power of the States citing the inconsistencies between State law and the Bill of Rights (as is noted above regarding the New York Constitution). They contend that the States would not have adopted the Fourteenth Amendment if they knew that it would have resulted in imposing conflicting principles.
These arguments are contradicted by the statements made in debate by the drafters and proponents of the Fourteenth Amendment who opined that the States were already restricted by the first eight amendments to the Constitution[15] and by subsequent decisions of the Supreme Court (see, New York Times Co. v Sullivan, infra).
Much of the doubt regarding the scope of the Fourteenth Amendment sprang from the Supreme Court’s postwar reluctance to enforce the expansion of rights set forth in the Thirteenth and Fourteenth Amendments,[16] beginning with the cases of United States v Cruikshank (92 US 542 [1875]) and Crescent City Live Stock Co. v Butchers’ Union (120 US 141 *331 [1887]). "The radical plan to protect the Negro by subjection of the states was thus 'demolished’ by Waite and his associates * * * This marked the overthrow of the congressional plan of reconstruction within seven years after the adoption of the Fourteenth Amendment.” (Trimble, Chief Justice Waite: Defender of the Public Interest [1938].)
Ultimately, the Supreme Court put aside Cruikshank and Butcher's Union (supra), and the modern understanding of the Fourteenth Amendment took hold. Gradually the State practice of using tax revenues to build churches and to pay ministers’ salaries has ended, prayers have been banned in public schools, restrictions on religious practices have been lifted and when Mr. Sullivan brought suit against the New York Times, the Supreme Court cited the First and Fourteenth Amendments as overriding State Constitutions and the common-law right to sue the press. "There is no force in respondent’s argument that the constitutional limitations implicit in the history of the Sedition Act apply only to Congress and not to the States. It is true that the First Amendment was originally addressed only to action by the Federal Government, and that Jefferson, for one, while denying the power of Congress 'to controul the freedom of the press,’ recognized such a power in the States. See the 1804 Letter to Abigail Adams quoted in Dennis v. United States, 341 U. S. 494, 522, n. 4 (concurring opinion). But this distinction was eliminated with the adoption of the Fourteenth Amendment and the application to the States of the First Amendment’s restrictions. See, e.g., Gitlow v. New York, 268 U. S. 652, 666; Schneider v. State, 308 U. S. 147, 160; Bridges v. California, 314 U. S. 252, 268; Edwards v. South Carolina, 372 U. S. 229, 235.” (New York Times Co. v Sullivan, 376 US 254, 276-277, supra.)
Thus, the adoption of the Fourteenth Amendment was part of a constitutional revolution that effected a wholesale amendment of all State Constitutions, not only ending slavery, but denying the States any further power to control religion, speech or the press. It provided for national citizenship and a filter through which all State Constitutions and laws must pass or be nullified.
THE PRESENT STATUS
Notwithstanding the Fourteenth Amendment, the Supreme Court has demonstrated little enthusiasm for the concept of absolute press freedom (as it has been loath to consider any rights to be absolute). It has held that not all speech is of equal *332 First Amendment importance. It is speech on " 'matters of public concern’ ” that is "at the heart of the First Amendment’s protection.” (First Natl. Bank v Bellotti, 435 US 765, 776 [1978], citing Thornhill v Alabama, 310 US 88, 101 [1940].) The Supreme Court has diminished basic First Amendment principles by embracing the competing interests of the common law. (See, e.g., New York Times Co. v Sullivan, supra [allowing criticism of public officials to be regulated by civil libel if the plaintiff shows actual malice]; Gertz v Robert Welch, Inc., 418 US 323 [1974] [allowing greater regulation of speech harming individuals who are not public officials, requiring a negligence standard].)
The Court in Times (supra) and its progeny has continued to read exceptions into the First Amendment. The framers never contemplated these accommodations to the common law. To introduce common-law principles after the Constitution was amended to create national rights does violence to the expansion of First Amendment protections adopted after the Civil War and erodes the public’s right to information and opinion on matters of legitimate public concern. Rights secured and preserved at such terrible cost should not be so readily surrendered.
THE LOCHNER DOCTRINE
Interpretation of the Constitution to the point of amendment has happened before. This exercise of extraconstitutional power is a continuation of the judicial philosophy typified by the Court in the Lochner era, a standard now discredited. (Lochner v New York, 198 US 45 [1905].) The Lochner doctrine imposes upon the Constitution the political assumptions that for the moment dominate the Court. (See, Siegel, Lochner Era Jurisprudence and the American Constitutional Tradition, 70 NC L Rev 1.)
Criticizing such judicial activism in the context of Lochner (supra), Justice Hugo Black stated: "A bare majority of the Supreme Court of the United States have been for a number of years assuming the right on their part to determine the reasonableness of State and Federal laws. The Constitution never gave that majority any such power.” (Mar. 24, 1937, speech, reprinted in Congressional Record, Appendix, at 638-639 [1937].)
What was true of Lochner (supra) is true of Times (supra).
Times (supra) was an attempt to preserve the law of libel in a benign manner. After all, who would be offended if deliber *333 ately malicious speech was punished? Experience has taught us that the cost of. this accommodation has been expressed in the stifling of criticism, not only of the actions of the government but also of the actions of the powerful, the rich or the popular. "Finally, courts should not be oblivious to the crippling financial burden which the defense of libel claims entails, even for major news organizations, and the consequent chilling effect this burden can have on the dissemination of news. (Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 384; see Garbus, Libel Law, 20 Years After New York Times v. Sullivan, NYLJ, March 9, 1994, p 1, col 3, p 4, col 1.) ' "The threat of being put to the defense of a lawsuit * * * may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself’ [citations omitted].’ (Karaduman v Newsday, Inc., 51 NY2d 531, 545.)” (Freeze Right Refrig. & Air Conditioning Servs. v City of New York, 101 AD2d 175, 181 [1984].)
Draco’s Code with its harsh punishments likens to the law of libel. Libel is also excessive, controlling the press with such concomitant harm to the public interest that its cost is unacceptable.
"Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.’ Mill, On Liberty (Oxford: Blackwell, 1947), at 15; see also Milton, Areopagitica, in Prose Works (Yale, 1959), Vol. II, at 561.” (New York Times Co. v Sullivan, supra, at 279, n 19.)
"If the press could be faced with possibly sizable damages for every mistaken, publication injurious to reputation, the result would be an unacceptable degree of self-censorship, which might prevent the occasional mistaken libel, but would also often prevent the timely flow of information that is thought to be true but cannot be readily verified. The press must therefore be privileged to spread false information, even though that information has negative First Amendment value and is severely damaging to reputation, in order to encourage the full flow of the truth, which otherwise might be withheld.” (Dun & Bradstreet v Greenmoss Bldrs., 472 US 749, 770 [1985] [White, J., concurring opn].)
The freedom of the press is either absolute or limited. History and good sense dictate that it be absolute.
*334 CONCLUSION
This court acts from the conviction that the right that is "the freedom of the press” has never been the property of the press nor does that right afford the press any privileged status. Freedom of the press is the right of the people to access information and opinion unfettered by governmental action so that citizens can determine what the truth is. In the simplest of terms, freedom of the press is not the right to write, it is the right to read.
Yet, what of a press that is noble in purpose but is often innocent of virtue? Although we choose to deny to this plaintiff the right to sue, this court is mindful of the need for a remedy. To this end, reference is directed to the recommendation concerning alternative dispute resolution in the accompanying common-law opinion.
Accordingly, the complaint is dismissed. The remaining applications for relief are denied as moot.

. "Distinguishing between assertions of fact and nonactionable expressions of opinion has often proved a difficult task. The factors to be considered are: '(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to " 'signal * * * readers or listeners that what is being read or heard is likely to be opinion, not fact’ ” ’ (Gross v New York Times Co., supra, at 153, quoting Steinhilber v Alphonse, supra, at 292; accord, Immuno AG. v Moor-Jankowski, supra).” (Brian v Richardson, 87 NY2d 46, 51 [1995].)

. That common quotation is not accurate. Justice Black stated in his concurring opinion in Smith v California (361 US 147, 157 [1959]): "That Amendment provides, in simple words, that 'Congress shall make no law * * * abridging the freedom of speech, or of the press.’ I read 'no law * * * abridging’ to mean no law abridging”

. Translated 1975.

. Pater, Plato and Platonism, at 122 (London 1910).

. Kenyon, The Political Thought of the Anti-federalists, The Antifederalists, xlv (1966).

. See, Beveridge, The Life of John Marshall, ch VIII: Popular Antagonism to Government (1929).

. In contrast, although today we possess a reasonably diverse population, if the standard of diversity is not race or ethnicity but our social and philosophical outlook, an argument can be made that we now possess a more homogeneous population. Our obvious differences of race, gender, religion or region aside, because of modern communications and travel, we tend to understand that our problems and their solutions are common to us all, even if we are yet unable to reach broad consensus on what the solutions should be. (For a description of community isolation and poor communications at the time of the framing, see, Weld, Travels Through the States of North America, and the Provinces of Upper and Lower Canada During the Years *327 1795, 1796 and 1797 [3d ed London 1800]; see also, Diary and Letters of Gouverneur Morris [London 1889].)

. See, Elliot, The Debates in the Several State Conventions of the Adoption of the Federal Constitution, iii, at 652 (1896).

. Id., iii, at 653-663.

. Elliot, Proceedings in the Virginia Convention of 1788, iii.

. Just as Montesque’s misunderstanding of the structure of Britain’s Parliament helped to lead the framers of our Constitution to create a superior form of Government, the popular assumption that the intention of the framers was to secure the broad liberties we now enjoy and assume to be our birthright has moved the present consensus well beyond "original intent.”

. That the Constitution broadly denied the Federal Government power, especially over speech, see also, Report of the Committee Concerning the Alien and Sedition Laws, in The Mind of the Framer: Sources of the Political Thought of James Madison, at 256-267 (Meyers ed 1981).

. See, Levy, Introduction to Freedom of the Press From Zenger to Jefferson, xix, at lvi-lvii, n 241 (1966).

. See, Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights% 2 Stan L Rev 5 (1949).

. See, Congressional Globe, 39th Cong, 1st Sess 158 (Jan. 9, 1866).

. Aynes, On Misreading John Bingham and the Fourteenth Amendment, 103 Yale LJ 57 (1993).